Good afternoon, your honors. This is the court. I'm David Kaplan. I represent the appellate Kenneth Morgan. I will be watching the clock and try to save about three minutes for my rebuttal. The case of Batson v. Kentucky requires that, at step three of the analysis triggered by a challenge to a periphery strike, the district court must undertake a sensitive inquiry into such circumstantial and direct evidence of intent as may be available. What happens in this case when the trial lawyer challenged the prosecutor's strike of the Asian-American juror No. 26 is essentially there was some discussion. The prosecutor gave rationales, and the district court said, I agree that that juror showed hesitation when she was asked about the fairness of a deep lie trial she sat on. I think that's a nondiscriminatory reason that has been challenged tonight. You know, I understand your brief said that there's no dot, dot, dot that the court recorder would put, so there was hesitation. The prosecutor said there was hesitation, and the judge said there was hesitation. Why doesn't that operate as a fighting effect that there was hesitation? The transcript shows an immediate response that she thought she would notice. It doesn't say whether it was immediate or not. It just says the words of the question and the words of the answer. Usually an ellipsis is used when words are omitted, and no one's contending that any words were omitted. You're suggesting that an ellipsis would be used if there was hesitation, and I don't understand. I can see where you could legitimately argue that the court reporter might have put a bracket, a hesitation, a closed bracket, and that the ellipsis means the same thing. I can see where that could be argued, but I can't see, once the trial judge says there was hesitation, why didn't that feed into the hesitation issue? There is the fact that the court followed up with other jurors who seek hesitant and said, you seek hesitant, tell me more, and there is the fact that there was another juror who didn't say, I believe so, and that was in reference to a deep lie trial. There may have been confusion, but let me take as a given, let me take as a given that this court will defer to the trial judge's finding that the juror 26 was hesitant in that answer. There's three, there's two additional problems with that being the best analysis instead of three. The first problem is, even with that rationale, the hesitation in that answer, under Congress scrutiny, would be revealed to be not a plausible justification for striking a juror because, in Miller-Ell and in this court's decision in Kessler v. Cameron and in many other cases, additional scrutiny is required. The prosecutor, if she truly were that concerned about that apparent hesitation in juror 26's answer, she would have asked questions about it. I don't see that. My experience doing court here, when I was involved in criminal defense, I would really need to explore a problem further because some stuff that could come out that could keep the rest of the jury. Well, she certainly could have asked for a confidential further questioning out of hearing of the other jurors, if that were a concern. But it's an observation made many times in the Miller-Ell decision, made a few times in the Kessler decision of this court, that if it's the real reason for striking a juror, the prosecutor is expected to ask questions about it. And in fact, it's quite significant that no questions are asked here because there is no context for whatever that hesitation might have been based on. The fact is, if they had asked this juror, why are you hesitant about the fairness of that DUI? A lawyer could reasonably think that this juror might be trouble. I don't know who she's going to be trouble for, but she might be trouble for me because she was on a hung jury, and for all I know, she hung it, and she has an unusual hobby, the Star Wars convention volunteer or something like that. It might mean that she's pretty individualistic, and strong individualistic and a little offbeat, and on a hung jury could mean I'm going to have trouble getting a unit out of this version. It seemed like, I don't know why, that would indicate that the prosecutor was racist and bumpier. Well, if the prosecutor were concerned about those things, again, it's a little mysterious why the prosecutor didn't ask a single question. You're suggesting... What I'm saying, I'm not just suggesting, is that when I was doing this stuff, if you're going to bump them, you keep your mouth shut because of all the bad stuff that can come out. I recall an ancient shoplifting trial where the defense was going to be, she didn't know she'd put it in her bag, and at the bar there, a bunch of jurors started saying, oh, I thought that was something that I threw out to pay for to talk about the teeth injury. Well... Why you don't ask questions. Again, that could be dealt with by simply having a confidential talk at the sidebar with individual jurors. It happens all the time. I certainly see it all the time. But there's an additional, I'm only going to focus on an additional factor that the district court also did not contemplate or discuss at all, which is there is a very painfully bogus justification that this prosecutor also gave. She said, I'm concerned that juror 26 had a friend who is apparently in jail for a homicide, and I'm concerned that she had a friend who was raped. Now, all you have to do is do a comparative analysis, which the trial lawyer noted and suggested to the district court with some specifics, and the district court made no mention and apparently gave no consideration to that. Juror number two had an aunt who was in jail for theft and drugs, juror number 13 had a brother who was prosecuted for arson, and an aunt house arrest has a time of our dear for DUI. The answer the government gives in the appeal is, well, the prosecutor thought it was too weird that juror 26 didn't know much about her friend's homicide. Well, she didn't seem to worry about juror 13's own brother having been prosecuted for homicide. He said he didn't know much about that. He had closely followed that. His own brother was in house arrest for DUI. He said he didn't know much about that agent. That guy got, that non-agent got on the jury. Now, when you have some, let's say there are a few, something that court focuses on or that the prosecutor articulates that seems plausible, but then you have other things like this that seem very suspicious. The question is, what does the precedent tell you to do? Well, the precedent tells you that even if there are some rationales that seem plausible, when there are others that seem very suspicious, fishy and don't add up, reversal is called for, and the leading case is Chinchilla from this court, followed up and reiterated in cases like Kisser v. Camera and supported by the most recent major Supreme Court decision on that, which is Snyder v. Louisiana, where the Supreme Court noted that there was a reference to the demeanor of a juror, did not have a fighting to defer to, but did not have any reason to reject that. Some of the other rationales were suspicious and said it appears that this was motivated at least in substantial part by a suspicious rationale and that was enough to call for best relief. So the district court clearly erred by undertaking a very myopic, a very limited best analysis in the face of that challenge and overlooked substantial evidence that this was a contextual strike. I'd like to speak for a moment about the second issue that we raised in appeal, which was the denial of self-defense instructions. Now, I would describe this case and the evidence in this case as sort of an evidentiary donut, but since I know there's at least one other native New Yorker here today, I'll describe it as an evidentiary bingo. What I mean to say is there was a substantial amount of evidence about what happened before the victim was injured and there was substantial evidence about what happened after the victim was injured, but right in the middle of the evidence is this hold. Why is it such a hold? It seems like there could be reasonable evidence. You've got a witness who says there was something, I can't remember whether he said anything, in his hand, and you've got a witness that the victim is trying to get away from the defendant. He runs around the TV set and that sort of thing, and you've got a witness that says the first blow was by the defendant, and you've got a witness, a medical witness, who says that there was something sliced off. I would indicate it was a knife. Now, why couldn't any reasonable person put that together and say, gee, it kind of looks like the defendant had this guy and slashed his ear almost off with a knife? They could. They could, and this is a critical point. I am not arguing, and I don't wish to be understood to be arguing that this evidence was insufficient to allow the inference. This court's built in the bagel that way. What I am arguing is that if a self-defense instruction had been given, a jury could rationally have found that the burden would have been placed on the government, not my client to prove self-defense, but on the government to prove beyond a reasonable doubt the absence of self-defense. That's true, but at least some evidence that's more than a scintilla. If there is self-defense, what was the evidence for self-defense? The evidence for self-defense was, first off, the fight started with a punch, and the witness was clear. Adrienne was clear. She saw his hand punch, and there was no knife in the hand. Secondly, the victim, Mr. Gutierrez, did not run and cower. He turned and he fought back. That was what your eye said. He turned and he started immediately fighting back. The fight started in the kitchen. Adrienne said Mr. Gutierrez lived there. He knew where the knives were in the kitchen. There's no testimony who picked up a knife first. For all that the evidence shows, it could have been the resident of that house in the kitchen who picked up a knife in the kitchen and first used it to thrust it at Mr. or at my client. That was the part of the fight that your eye didn't see, and no witness testified to or described. So the jurors could consider that. The jurors could consider just the physical appearance of Mr. Gutierrez. There's photographs of him. There is his size and his apparent strength, and also his strength is shown by the fact that he used what the government referred to as a giant TV, and there is a photograph of it in the exhibits, to fend off Mr. Morgan while Mr. Morgan was coming at him. And he just ran around behind Mr. Gutierrez, a real big, strong guy. Yes. If you look at the photographs, he looks like a powerful, strong man, and his strength is demonstrated by using this large TV and using the door to hold back Mr. Morgan at the end of the fight when your eye is so that far as well. So, and the question you have to ask yourself if you're the jury and you have this instruction is, could I reasonably find in the light of all those surrounding facts, surrounding this hole in the bagel, that the government proved beyond a reasonable doubt that their version must have been what happened and not the defense suggestion that Mr. Gutierrez, in his own teaching, picked up the knife first, and then it was perhaps turned against him in defense by Mr. Morgan. So how did the defense make the suggestion in trial? Beg your pardon? How did the defense make that suggestion in trial? The defense requested in writing that the instruction be given before trial, and the defense asked in the course of trial that the instruction be used, and it was denied. What testimony did the defense either present on direct examination or elicit on cross-examination to support the inference that the instruction should have been given? They elicited all those facts, except for the photographic facts. They elicited the facts about where the knife was, where the knife was started in the kitchen, et cetera. Those were brought on cross-examination and argued in the opening and in the closing. Okay. I would like to let me say a little something to that end. Okay. Thank you. May I please record my name is Crystal Lanham, and I represent the United States. I want to get started where a defense counsel started and with the questions that Judge Kleinfeld was asking. Let me ask you about something where the appellant's response, certainly is especially powerful, and that is the comparative analysis point. We have a whole bunch of jurors with as much contact with crimes by and against family members as this one, but this is the only one that gets bumped. How do you make that any other than a pretext for claim? Your Honor, I have two points in relationship to that. First of all, this court has required, following Cook and the cases afterwards, to look at all of the characteristics of this juror. So it's not just in isolation looking at the analysis of the crime victim and the friend who had committed a homicide, but instead looking at also the reason that the district court found the hesitation of the juror and also the fact that the juror was on a hung jury in the science fiction convention. So that's sort of a more global point. So even if one of the prosecutor's arguments looks pretextual, that's not enough to conclude? Absolutely. Yes, and I want to be clear on that. We are not saying that this was a pretextual reason at all, and I think that the other part of Cook, or sorry, of C. Fuentes, that really comes into play here is that this court has to look with a pretty specific level of detail at the comparative analysis. So C. Fuentes was doing a comparative analysis of exactly this type of point, the crime victim relationship to crime victims, and it said, well, you know, the prosecutor pointed out that this person had a friend who was essentially who had committed murder or something along those lines. That's a much briefer crime than the arson of a car in a parking lot or than, you know, the low-level drug cases that the defendant cites to care. So my argument on that would be that this isn't actually really even a very good comparative analysis. Certainly the juror doesn't have to share all of the characteristics, but this court does have to take a look at all of the characteristics, and it really is hampered when it can only conduct a comparative analysis on one of the points. So what you're saying is even if you think the relationship to other crimes didn't amount to anything because it did on the other jurors, the other reasons for pumping are dead. What are you saying when you take that in combination with the other things? I'm saying both. I'm saying both that the comparative analysis is flawed because you don't have people who committed crimes as brave as juror number 26's friends and neighbors had committed to them. And also that post-Cook, the analysis that the defendant is bringing in here, Chinchilla and the other cases that he cites all really go to this mixed-motive analysis that the court rejected firmly in Cook. And in Cook there was one reason out of four that the prosecutor gave that the court said, well, you know, that's part of your claim pretextual. And it said, don't throw the baby out with the bathwater. They affirmed and rejected the bathroom challenge in that case, even though there was one sort of suspicious reason, because you have to take all of the reasons all together. You can't just take one reason in isolation. In terms of the science fiction analysis, obviously no one else here, I think the defense is suggesting that, you know, this is somebody who is reading Isaac Asimov novels in bed and, you know, this is somebody who, as Judge Kleinfeld pointed out, is really kind of offbeat. This is somebody who is going to these conventions and fluent in Klemot. And, you know, if that wasn't on the record, that's certainly something that the prosecutor is entitled to infer from her general knowledge of somebody who volunteers at a science fiction convention, as opposed to somebody who just, you know, might be attending the latest Star Trek movie. So in terms of the bathroom challenge, and certainly on the record, the hesitation is absolutely reflected. But in the record, just evidence of the hesitation. So the fact that the district court noted the hesitation shows the hesitation. I mean, the district court, that's troubling, because usually if you're going to apply on this hesitation, because it's not supposed to be a reason that the district court goes up and introduces it. It's supposed to be the reason that the prosecutor first mentioned it. And I want to be clear, the prosecutor did first mention it. It was in ER 224. The district court asked the prosecutor, what are your reasons? The prosecutor gave the hung jury a hesitation as the primary reasons for the strike, and then the district court said, I share that concern about the hesitation. Twice the district court said that in ER 224 and 225, but it was the prosecutor who raised that hesitation first, just to be completely clear. In terms of the challenges to the trial evidence and the self-defense jury instruction here, there was absolutely no evidence at all to support the giving of a self-defense jury instruction. And so the district court correctly refused to give it. To answer your question. The guy was bigger, and the defendant made the mistake of attacking him in the kitchen where the knives were available to him. Two points in response to that. First of all, there's no record evidence of the comparative size between the victim and the defendant in this case. I have no idea how large the defendant may have been. We have no idea how large the victim may have been, except for the defense attorney now standing and saying, take a look at the pictures. He looks. The pictures are in the record. There aren't pictures of the defendant in the record to suggest the comparative size of these two individuals. I mean, what are we to make of the fact that Martin was acquitted of the assault with a deadly weapon count? Is that more consistent with this evidence supporting a self-defense? I don't think so. Respectfully, Your Honor, the reason that it appears that the jurors acquitted was because Uriah Miguel's testimony was not specific as to the type of deadly weapon that was used. Uriah Miguel said it was something shiny. And so the way to reconcile this acquittal versus the guilt on the assault with serious bodily injury is that they didn't find that a dangerous weapon was used because they didn't know what it was. It was something shiny. It doesn't really go to the self-defense at all. And I would note, just to respond completely to some of the questions that the Court was asking defense counsel, ER 223 is the only, sorry, 253 is the only statement at all in the record that defense counsel asked of Adrian Thomas in the case about, did Anthony Gutierrez know where the knives were located? And Adrian Thomas answered yes. There's no suggestion that the knives were located, for example, in a faraway drawer in a place where nobody could have found them. If this Court were to require a self-defense jury instruction on this record, it would have to require one every time, for example, a fight breaks out at a steakhouse. Everyone knows where the knives were. The knives could have been on a counter. The knives could have been in the drawer. There's just no evidence of that. There also is no evidence that the defendant didn't come in with a knife, and that's precisely why this is necessary. So, what did they have to give in self-defense instruction if a fight broke out at a steakhouse? That's not the law of this Court. I would point to the Urena case, which has- The law is that there's a scintilla of evidence. The law is that there needs to be more than a mere scintilla of evidence, and that does not exist here. Sorry? There's a two-scintilla of evidence. There's only one scintilla here, even if at all, I would suggest, because the only question in the record is, did Anthony know where the knives were? With regard to the size of the defendant, isn't that in the pre-trial bond report? That wasn't before the trial court in terms of a jury instruction. It certainly wasn't before the jury. Well, in terms of us reviewing the records to determine the comparative sizes. I'm not sure whether it was in the pre-trial bond report or not. But it wasn't something that was presented to the jury, and so if the district court had given this instruction, it wouldn't have been stained by the evidence. The jury had the opportunity to eyeball both. The victim didn't testify at trial, so the jury didn't have the opportunity to eyeball the victim. So on that point, also, I would just point to the Urena case, which had very similar facts to this one. The defendant argued in the course of a prison fight that the victim may have been the one who first possessed a shake in the fight. And for two reasons, the court rejected the idea that a self-defense instruction should have been given there. First of all, because it was mere speculation, just as it is here. And second, because the defendant was the one who started the fight. Again, just to clarify. Also, it actually says that they found the shake on the defendant afterwards. He admitted that he brought the shake. He did. They didn't find the defendant in this case until much later. So if we're looking at whether there was a mere scintillant of evidence or not. They didn't find a knife on the defendant in this case. They did not find a knife on the defendant in this case. It's true. It is. And the defendant didn't get the cream knife. That is correct. Which is, again, different from Urena. Another difference from Urena, however, is that the defendant wasn't found in this case until much later. He wasn't arrested immediately afterwards, as in Urena, so that he had a chance to dispose of the knife. But that's the government's theory. That he had a chance to dispose of the knife, you said? Correct. So he wasn't arrested until later. One of the consequences of that happening is perhaps the government has to allow him to present his theory in advance without having the evidence clearcut. I don't believe that's the law, Your Honor. I think that it comes down to the mere scintilla analysis, and the fact that the only thing in the record here really is that question, is the question to Adrian Thomas. In terms of the prosecutorial misconduct argument, there's no suggestion that this could be anything other than harmless, as the defendant essentially concedes now the victim was slashed. So the fact that the prosecutor slightly stated differently, or joined inference from the testimony slightly differently, really can't be anything other than harmless in this case. And as to the supervised release conditions, we would just ask this Court to do the same thing that the panels in the Lee, Bitson, and Kasada cases did, and hold that because there is no clear law invalidating these standard conditions, that it was not plain error to impose them. If there are no further questions, we would ask this Court to defer. All right, Mr. Caput. With respect to what the government refers to as mixed motive analysis, mixed motive is a completely separate issue. Mixed motive, as Judge Gordon-Lazaru already written, that opinion in Kessler, is about there being an additional stage of Batson analysis, and that was rejected in Coughlin. Mixed motive analysis, that doctrine, has nothing to do with what I'm saying is based in Chinchilla, and Kessler, and Santa Rosa, Louisiana, and other cases, which is that the Batson challenge has merit, even when one or more rationales given do not appear to be protectual, yet there are other rationales given that do not withstand scrutiny and do appear to be protectual. So I think that is not correct, to use mixed motive analysis doctrine in that fashion. As far as the idea of fights at the steakhouse, if I could just draw out the food analogies a little more, I don't think there's any blanket rule about fights at a steakhouse or similar circumstances that my position requires you to accept. It only applies to similar cases that are bagel-shaped, donut-shaped, where there's a gaping hole in the middle. If there's witnesses that describe the entire fight as a steakhouse competition. It's not that gaping, though. I mean, the jury kind of thought, well, we don't really know for sure, it's a knife, and for sure it's what we need to know for the analogies to hold out. It could have been a broken beer bottle. It could have been just the odd piece of metal that gets off and laying around in the dirt. It could have been a piece of metal that fell off a car. It could have been any number of things. I'm sure it will be. But we do know it kind of wound up on the ground, was here on the spot, and the prosecutor could have listened to it and thought it must have been a knife because the doctor says it looks like a knife was used. I don't see the whole thing gaping. Just to be clear, what I'm saying is gaping, what's missing in that middle of the bagel is not what the weapon was. And I accept the jury might have had doubt about what exactly the weapon was. The defense counsel suggested it could have been a broken glass from the TV or a broken plate. The question is, how did that injury happen? Did it happen in a self-defensive way while they were stripping over the sharp object and my client pushed it back to save himself, or did it happen in a completely offensive way where my client used it while the other person was just trying to defend himself? That's the key to the case. Thanks a lot, Mark. Thanks, Bessie. Sir, you've gotten here. The defendant doesn't testify, is that right? And the witness doesn't testify. And the witnesses are reticent and restrained and careful in what they say as though they were academic scientists, being careful not to overstate what the jury and the prosecutor know for all reasonable reasons. Absolutely. And, again, I'm not disputing that. That's why the burden is so important. My position is not that no reasonable jury could convict, but that a reasonable jury could find that the government failed to prove beyond a reasonable doubt that self-defense was not the explanation for that injury. That's the key to this issue. And if the discretion had been given, a reasonable jury I submit on this evidence could have found that the government did not meet its burden on a reasonable doubt of showing this was not a self-defensive circumstance as to the cause of that injury. All right. Thank you, counsel. Thank you. Thank you. Thank you.
judges: Kleinfeld, Wardlaw, Morris